[No. C033411. Third Dist. Dec. 13, 2000.]

In re DAKOTA S., a Person Coming Under the Juvenile Court Law.
SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN
SERVICES, Plaintiff and Respondent, v.
SANDRA S., Defendant and Appellant;
ARTEMEAS K., Respondent.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

George R. Robertson for Defendant and Appellant.

Robert A. Ryan, Jr., County Counsel, and Lilly C. Frawley, Deputy County Counsel, for Plaintiff and Respondent.

S. Lynne Klein for Respondent.

John L. Dodd, under appointment by the Court of Appeal, for Minor.

## Opinion

**SCOTLAND, P. J.**—Sandra S. (appellant), the mother of Dakota S. (the minor), appeals from orders of the juvenile court modifying the minor's placement and selecting a permanent plan of guardianship with the minor's foster parent, who had been given de facto parent status. (Welf. & Inst. Code, §§ 366.26, 388; further section references are to this code unless specified otherwise.) Among other things, appellant claims that the orders must be reversed because the Sacramento County Department of Health and Human Services (DHHS) did not prepare, and the juvenile court did not consider, an assessment of the foster parent as the prospective guardian.

In the published portion of this opinion, we observe that DHHS failed to comply with its statutory obligation to submit a preliminary assessment of the foster parent's eligibility, commitment, and suitability as a prospective guardian. (§ 366.22, subd. (b).) We do not take this omission lightly. After all, the purpose of the assessment is to provide the juvenile court with information necessary to determine whether guardianship is in the dependent child's best interests, and whether the prospective guardian is an appropriate person to assume the duties of guardianship. Nevertheless, we conclude that, by failing to object in the juvenile court that DHHS had not submitted a preliminary assessment of the prospective guardian, appellant has waived her right to raise this omission as a basis to reverse the guardianship order. In any event, we find the lack of a preliminary assessment required by statute did not result in a miscarriage of justice because the juvenile court received, in other forms, the information that would have been contained in the preliminary assessment.

In the unpublished parts of this opinion, we reject the remaining claims of error. Accordingly, we shall affirm the orders.

### Facts

After appellant was arrested for selling drugs, the minor was removed from parental custody in November 1996. The juvenile court ordered appellant to comply with a family maintenance plan, and returned the minor to her

custody. Almost a year later, the court found that appellant had failed to comply with the service plan. Consequently, the minor was placed with a licensed foster parent, Ms. Artemeas K. (the foster parent), under the auspices of Abriter Foster Family Agency, Inc. (Abriter).

By the time of the 18-month review, the minor had reacted positively to foster placement, but continued to have a strong bond to appellant. Unfortunately, appellant continued to have drug problems and failed to complete reunification services. The foster parent wanted to adopt the minor, and the social worker opined it was in the minor's best interests "that a permanent plan of either adoption or guardianship be offered with his current foster parent." The juvenile court terminated reunification services and scheduled a section 366.26 hearing.

In January 1999, the minor was removed from the foster parent's home based upon allegations that the foster parent inflicted corporal punishment upon Frankie, another foster child in her home. Thereafter, the foster parent petitioned for de facto parent status and filed a section 388 petition, seeking an order returning the minor to her care and custody.

The DHHS assessment prepared for the section 366.26 hearing recommended placement of the minor in long-term foster care rather than guardianship due to the circumstances surrounding the minor's removal from the foster parent's home and because the social worker believed that the foster parent was attempting to interfere with the minor's bond to appellant. Letters attached to the assessment stated that the foster parent had lost her certification, and it was reported that the minor had said he did not want to return to the foster parent's home.

The juvenile court combined the section 366.26 hearing with the hearing on the foster parent's request for de facto parent status and her petition for modification to return the minor to her custody. The court proceeded first on the motion for de facto parent status.

Lawrence Budney, who had been the DHHS reunification social worker on this case, testified that he rated the foster parent "good" to "exceptional" and that the foster care agency had said she was "one of [its] best" foster parents. Budney testified he never saw evidence that the foster parent had inflicted corporal punishment on any child or that she had tried to alienate the minor from appellant. Based upon his past experience and knowledge of her, Budney opined that the foster parent would be "an excellent guardian of [the minor]."

Leon Wells, an Abriter social worker who had worked with the foster parent and her two foster children from October 1997 to May 1998, testified

that she was a particularly good foster parent. In Wells's view, the foster parent was a nurturing and caring person with a gentle manner who explained things to the children rather than punishing them. Having observed that the minor had a genuine attachment to the foster parent, Wells never suspected the foster parent of employing corporal punishment on the minor or her other foster child, Frankie. Rather, Frankie had been struck by his biological mother during a visit in November 1997, and had bruises after another visit in July 1998. Also, Wells never saw any indication that the foster parent was attempting to alienate the minor against appellant. Wells opined that the foster parent would be an appropriate guardian for the minor based upon "the totality of her experience with [the minor]" and because "she does appear to have his best interest at heart . . . ."

Abriter social worker Pamela Pittsford, who had been assigned to work with the foster parent in July 1998, testified that the minor told her Frankie had been spanked, and that Frankie confirmed the spanking had occurred. Pittsford did not ask when the incident occurred, and an examination of Frankie revealed no evidence of physical abuse. When asked about it, the foster parent denied hitting the children. According to Pittsford, an Abriter administrator concluded that there was "probably nothing to it [the reported spanking]." However, without being specific as to why, Pittsford testified that she had "doubts" about the foster parent and "mistrusted" her. Pittsford acknowledged that she had continued to make positive reports about the foster parent because Pittsford "wanted to believe [her]." Pittsford explained: "Do you know what, I put in all the good stuff and none of the bad stuff as I was hoping it was all okay."

At the conclusion of this phase of the combined hearings, the court granted de facto parent status to the foster parent and ordered that evaluations be made of appellant, the foster parent, and the minor's aunt "for the purposes of determining the appropriate placement and/or guardianship of [the minor]."

The evaluations, submitted by the Child & Family Institute, concluded that the minor was "bonded very well" with the foster parent and demonstrated a greater range of emotion and spontaneity while with her than with appellant. According to the study, appellant was not attuned to the minor's needs, was physically intrusive, and could not spend time with the minor without trying to get him to meet her needs. Opining that the minor should not be placed with his aunt and should not have unsupervised contact with appellant, the study recommended that the foster parent be given care and custody of the minor.

Based upon this study, DHHS made an "oral recommendation" that the minor be returned to the foster parent's custody. At the court's direction,

DHHS prepared a supplemental report reiterating its new recommendation, but requesting that the "dependency be continued for six months in order to monitor the placement and the visitation schedule between [appellant] and the minor."

When the combined hearings proceeded in June 1999, the juvenile court accepted stipulations that witnesses would testify to the following: The minor enjoyed and looked forward to visits with appellant, and on one occasion appeared fearful of returning to the foster parent's home. On the other hand, the minor was happy in the foster parent's care, but was a very sensitive child who would get upset if deprived of privileges.

For reasons we need not recount here, appellant testified that she believed it was not in the minor's best interests for the foster parent to be his guardian.

Eileen Heinrich, a DHHS supervisor in the guardianship unit, testified about her observations of a visit during which the minor, the foster parent, and her teenage son played together in April 1999. In Heinrich's view, the foster parent was "very appropriate" and had a "positive bonding" with the minor, who hugged the foster parent, sat in her lap, and spontaneously shared a treat with her. According to Heinrich, this interaction was inconsistent with statements made by the minor indicating that he did not want to return to the foster parent's custody. Although she did not personally observe any such acts, Heinrich "had some suspicions" that the foster parent had used corporal punishment on the minor. Nonetheless, Heinrich had approved the recommendation that the foster parent be designated the minor's guardian.

Abriter administrator Richard Rosander testified that, although the agency was unable to substantiate the allegation of corporal punishment on Frankie in September 1998, he decided to decertify the foster parent and remove the minor from her home based upon the conclusion of a DHHS social worker that there was enough information to substantiate the allegation of physical abuse.

Laura Furcinitti, Frankie's DHHS social worker, testified Frankie told her that the foster parent, whom he referred to as "Mom," had hit him once on the foot. Furcinitti recommended against placing the minor with the foster parent "based on the fact that [the minor allegedly] had witnessed the corporal punishment of Frankie." On cross-examination, Furcinitti acknowledged that she did not ask Frankie whether he ever was hit by his biological mother and did not attempt to determine whether there was any confusion in

his reference to "Mom." Furcinitti also admitted that she never asked the foster parent about Frankie's allegation. According to Furcinitti, she did not do so because her "primary focus and function within the department is the safety of the child," and "[s]tandard social work procedure is the working assumption that the child is telling the truth and from there you proceed."

The parties then stipulated that Augusta Hunt, a social worker from Sacramento Child Advocates, Inc., would testify as follows: After the minor had been removed from the home, she evaluated the foster parent to assess her suitability as a prospective guardian of the minor. Hunt found the physical environment of the foster parent's home was "more than adequate." Based upon her assessment of the home and her interviews with several people, Hunt concluded that the foster parent would be "an appropriate legal guardian for [the minor]."

After assessing all the evidence submitted during the combined hearings, the juvenile court granted the foster parent's petition for modification of placement, and established a permanent plan of "guardianship between the minor . . . and [the foster parent]." The court terminated juvenile court jurisdiction and directed the clerk to issue letters of guardianship.

DISCUSSION

I

"Whenever a court orders that a hearing pursuant to Section 366.26 shall be held, it shall direct the agency supervising the child and the licensed county adoption agency . . . to prepare an assessment that shall include: [¶] (1) Current search efforts for an absent parent or parents. [¶] (2) A review of the amount of and nature of any contact between the child and his or her parents and other members of his or her extended family since the time of placement. . . . [¶] (3) An evaluation of the child's medical, developmental, scholastic, mental, and emotional status. [¶] (4) *A preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or guardian, particularly the caretaker, to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship. . . .* [¶] (5) *The relationship of the child to any identified prospective adoptive parent or guardian, the duration and character of the relationship, the motivation for seeking adoption or guardianship, and a statement from the child concerning placement and the adoption or guardianship, unless the child's age or physical, emotional, or other condition precludes his or her meaningful response,*

*and if so, a description of the condition.* [¶] (6) An analysis of the likelihood that the child will be adopted if parental rights are terminated." (§ 366.22, subd. (b), italics added; see also §§ 361.5, subd. (g), 366.3, subd. (h).)

As pertinent to this case, the obvious and important purpose of this statutorily required preliminary assessment is to provide the juvenile court with the information necessary to determine whether guardianship is in the child's best interests, and whether the prospective guardian is an appropriate person to assume the duties of guardianship. (See Welf. & Inst. Code, § 360, subd. (a) [when parent is not interested in reunification, legal guardianship may be ordered if it "is in the best interest of the child"]; Prob. Code, § 1514, subd. (b) [in appointing a guardian in an action other than a dependency proceeding, the court is governed by specified provisions of the Family Code relating to custody of a minor, including Fam. Code, § 3020, subd. (a) (court's primary concern is "best interest" of the child) and Fam. Code, § 3040, subd. (a) (other than to a parent, custody should be granted with preference to "the person or persons in whose home the child has been living in a wholesome and stable environment")].)

■ Appellant contends that the guardianship order must be reversed because DHHS did not prepare, and the juvenile court did not consider, the statutorily required preliminary assessment of the foster parent as a prospective guardian. But appellant never objected in the juvenile court to this omission.

■ " 'An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the [trial] court by some appropriate method . . . . The circumstances may involve such intentional acts or acquiescence as to be appropriately classified under the headings of estoppel or waiver . . . . Often, however, the explanation is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.' [Citation.]" (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261], italics added by *Doers*; *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468 [33 Cal.Rptr.2d 217].)

Moreover, it would be inappropriate to allow a party not to object to an error of which the party is or should be aware, " 'thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.' [Citation.]" (*Porter v. Golden Eagle Ins. Co.* (1996) 43 Cal.App.4th 1282, 1291 [51 Cal.Rptr.2d 338].)

██ Appellate courts have applied the waiver doctrine in dependency proceedings in a wide variety of contexts, including cases involving failures to obtain various reports required by statute. For example, in holding an appellant could not assert error in the failure of the juvenile court to conduct a bonding study where no objection had been made in the juvenile court, *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338-1339 [63 Cal.Rptr.2d 562] stated: "Many dependency cases have held that a parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court. (See *In re Aaron B.* (1996) 46 Cal.App.4th 843 [54 Cal.Rptr.2d 27] [failure to object to adequacy of adoption assessment]; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885-886 [48 Cal.Rptr.2d 763] [failure to challenge [juvenile] court's ability to set a section 366.26 hearing when it determined reasonable reunification efforts were not made]; *In re Anthony P.* (1995) 39 Cal.App.4th 635, 640-642 [46 Cal.Rptr.2d 107] [failure to request sibling visitation as part of a permanent plan]; *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1830-1831 [30 Cal.Rptr.2d 245] [failure to request alternative placement]; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412 [15 Cal.Rptr.2d 613] [failure to object to adequacy of adoption assessment]; *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 222 [4 Cal.Rptr.2d 101] [failure to object to qualifications of court-appointed psychologists regarding § 361.5, subd. (b)(2)]; *In re Riva M.* (1991) 235 Cal.App.3d 403, 411 [286 Cal.Rptr. 592] [failure to object to noncompliance with Indian Child Welfare Act]; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 836 [269 Cal.Rptr. 624] [failure to object to juvenile court's amendment of pleading to conform to proof].) As some of these courts have noted, any other rule would permit a party to . . . deliberately stand by in silence and thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable. (*In re Riva M., supra,* 235 Cal.App.3d at p. 412, citing *In re Christian J.* (1984) 155 Cal.App.3d 276, 279 [202 Cal.Rptr. 54].)"

The reasoning of these authorities compels the conclusion that, by failing to object in the juvenile court to the lack of a preliminary assessment of the prospective guardian, appellant waived her right to claim on appeal that the order of guardianship must be reversed because the juvenile court erred in failing to obtain that assessment as required by section 366.22.[1]

In any event, for reasons which follow, we conclude that the absence of the statutorily required preliminary assessment did not result in a miscarriage

---

[1]Appellant asserts that *In re Lisa D.* (1991) 227 Cal.App.3d 613 [277 Cal.Rptr. 918] entertained an appellate claim on this issue even though no objection had been raised in the juvenile court. But *In Lisa D.* did not discuss whether an objection had been made; the opinion undertakes no discussion whatsoever of the waiver doctrine. " 'It is axiomatic that cases are not authority for propositions not considered.' " (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [53 Cal.Rptr.2d 81, 916 P.2d 476], quoting *People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].)

of justice because the juvenile court was presented, in other forms, the information that would have been contained in the preliminary assessment.

One appellate court has reversed a guardianship order due to the failure to have a complete preliminary assessment. (*In re Lisa D., supra,* 227 Cal.App.3d at pp. 614-616.) It explained that, when implementing the responsibility to safeguard the welfare of dependent children, "the juvenile court must possess complete and accurate information concerning the children and their proposed guardian." (*Id.* at p. 615; see *In re Diana G.* (1992) 10 Cal.App.4th 1468, 1482, fn. 3 [13 Cal.Rptr.2d 645].)

Interestingly, *In re Lisa D.* did not explicitly respond to the county's argument that failure to fully comply with the statutory requirements for preliminary assessment of the proposed guardian did not justify reversal of the order because the parent "[did] not establish[] that he [had] been harmed or that a more favorable result would ensue from a [complete] report." (*In re Lisa D., supra,* 227 Cal.App.3d at pp. 615-616.)

We conclude that the failure to provide the juvenile court with a preliminary assessment report is subject to the harmless error provision of our state Constitution (Cal. Const., art. VI, § 13) when the court received, in other forms, the information that would have been contained in the preliminary assessment. We further conclude that, on the record in this case, the juvenile court did possess complete and accurate information concerning the minor and the proposed guardian; hence, the lack of a preliminary assessment report did not result in a miscarriage of justice.

The report would have provided the juvenile court with a preliminary assessment "of the eligibility and commitment of [the] identified prospective . . . guardian" by presenting eight types of information: (1) whether the prospective guardian has a criminal record; (2) whether the prospective guardian has been the subject of any referrals for child abuse or neglect; (3) whether the prospective guardian has the capabilities to meet the minor's needs; (4) whether the prospective guardian understands the legal and financial responsibilities of guardianship; (5) whether the prospective guardian has a relationship to the minor; (6) if so, the duration and character of that relationship; (7) the prospective guardian's motivation for seeking guardianship; and (8) the minor's views concerning the proposed guardianship, unless the minor's age or physical, emotional or other condition precludes a meaningful response. (§ 366.22, subd. (b).)

An examination of the record demonstrates that the juvenile court possessed each type of information prior to issuing its order.

(1) *Whether the prospective guardian has a criminal record.*

In order to be licensed as a foster parent, a person must pass a criminal records check. (Health & Saf. Code, § 1522, subd. (d).) The juvenile court had before it evidence that the foster parent had been "certified" as a foster parent by Abriter. The juvenile court also knew that the agency had "decertif[ied]" the foster parent based upon an allegation that she used corporal punishment on another foster child. But the evidence as to whether the foster parent actually used corporal punishment was conflicting, and the parties stipulated that, after investigating the reasons for the foster parent's decertification, and after conducting an evaluation of the foster parent's home, Sacramento Child Advocates, Inc., social worker Augusta Hunt concluded that the foster parent would be an appropriate legal guardian for the minor. Accordingly, the court knew that the foster parent had been a certified foster parent, and that the sole reason for her decertification—the alleged corporal punishment—did not disqualify her from serving as a licensed foster parent or legal guardian. Thus, because the foster parent would have had to pass a criminal records check in order to become a certified foster parent, the court necessarily knew the foster parent did not have a criminal record that would make her unsuitable to serve as a guardian. Consequently, a preliminary assessment report would have added nothing in this regard.

(2) *Whether the prospective guardian has been the subject of any referrals for child abuse or neglect.*

The record establishes that the foster parent had been the subject of one referral for child abuse. The court received evidence that the referral was investigated extensively, that there was conflicting information about whether the abuse occurred, and that social workers ultimately concluded the foster parent was an appropriate person to serve as guardian despite the prior referral. Consequently, a preliminary assessment report would have added nothing in this regard.

(3) *Whether the prospective guardian has the capabilities to meet the minor's needs.*

The record contains substantial evidence of the foster parent's capabilities to meet the minor's needs. We emphasize this by quoting from the study submitted by the Child & Family Institute: "Our assessment is that [the minor] is bonded very well with [the foster parent]. [The foster parent] was warm, supportive, and appropriate in guiding and in following [the minor's] lead in play. His range of emotion with [the foster parent] was substantially greater, with much greater spontaneity, than with either his mother or his

aunt. He was spirited and uninhibited in his play with [the foster parent], while remaining self-regulating. [¶] . . . He is able to be appropriately both independent and dependent with [the foster parent]. He also spontaneously chose to build a structure with her that both contributed to and both commented happily upon. [¶] . . . [¶] We recommend that [the foster parent] have and maintain care of [the minor]. She is loving, knowledgeable about child development, emotionally attuned to him, and brings out the best in him. We do recommend that she review consistency in parenting, as she on occasion tells [the minor] he needs to do something and then does not follow through with getting him to do it. This was a very minor flaw in their interaction."

Because the juvenile court was presented with substantial evidence of the foster parent's capabilities to meet the minor's needs, a preliminary assessment report would have added nothing in this regard.

(4) *Whether the prospective guardian understands the legal and financial responsibilities of guardianship.*

It is readily apparent from the "DECLARATION OF [THE FOSTER PARENT] IN SUPPORT OF APPLICATION FOR INTERVENTION AND REQUEST FOR DETERMINATION OF DE FACTO [PARENT] STATUS"—which reflects the foster parent's desire to have the minor as "a member of [her] family for all purposes" by "adopting him and caring for all of his emotional and physical needs on a permanent basis"—that the foster parent understands the legal and financial responsibilities of caring for the minor either as a guardian or adoptive parent. Moreover, because DHHS filed a supplemental report recommending the foster parent's appointment as legal guardian for the minor, it is presumed that DHHS advised the foster parent of those responsibilities. (Evid. Code, § 664.) Consequently, a preliminary assessment report would have added nothing in this regard.

(5) *Whether the prospective guardian has a relationship to the minor.*

As noted above, the record is replete with evidence of the foster parent's relationship to the minor as his foster mother. Consequently, a preliminary assessment report would have added nothing in this regard.

(6) *The duration and character of the prospective guardian's relationship to the minor.*

As we have noted, the juvenile court was presented with substantial evidence concerning the duration and positive character of the foster parent's

relationship to the minor. Consequently, a preliminary assessment report would have added nothing in this regard.

(7)  *The prospective guardian's motivation for seeking guardianship.*

The foster parent's declaration eloquently explains her motivation for obtaining the legal authority to have custody and care of the minor. After setting forth in detail all she had done to improve the quality of the minor's life, the foster parent summed up as follows: "Dakota is a member of our family for all purposes. We as a family love Dakota tremendously and wish him to be returned to our care and custody. Prior to Dakota being removed from my home, I was willing to adopt him or assume guardianship of him. I am completely committed to adopting him and caring for all of his emotional and physical needs on a permanent basis."

Because the juvenile court had substantial evidence of the foster parent's motivation for seeking guardianship, a preliminary assessment report would have added nothing in this regard.

(8)  *The minor's views concerning the proposed guardianship.*

The court knew that the minor had said in the past that he did not want to live with the foster parent. However, the court also was aware that the more recent bonding assessment noted how well the minor interacted with the foster parent, and opined that the minor "is bonded very well with [her]." In light of the minor's age—five years old when the juvenile court named the foster parent as guardian—a preliminary assessment report would have added little meaningful information in this regard.

In sum, the parties fully litigated, explored, and tested the foster parent's suitability as a guardian, and the juvenile court had ample information before it in making its ruling. Under the circumstances of this case, the lack of a preliminary assessment as required by statute did not result in a miscarriage of justice.

II, III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

*See footnote, *ante*, page 494.

## DISPOSITION

The orders of the juvenile court are affirmed.

Sims, J., and Kolkey, J., concurred.